UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------------------------X
                                               :

HLT EXISTING FRANCHISE HOLDING LLC,     :

                               :        12 Civ. 8295 (PAE)
                     Plaintiff,      :

                               :      <u>OPINION & ORDER</u>
                -v-                 :

WORCESTER HOSPITALITY GROUP LLC,      :

                      Defendant.     :

                               :
------------------------------------------------------------------------X

PAUL A. ENGELMAYER, District Judge:

      HLT Existing Franchise Holding LLC ("HLT"), a subsidiary of Hilton Worldwide, Inc.

("HWI") (collectively, "Hilton"),[1] a franchisor of Hampton Inn hotels, brings suit against its

former franchisee, Worcester Hospitality Group LLC ("WHG") for contract damages arising

from Hilton's decision to terminate the franchise for failing to meet its contractual obligations.

Hilton now moves for summary judgment. For the reasons that follow, that motion is granted.

---

[1] The Court refers to the Hilton entities as "Hilton" except in contexts in which it is important to distinguish the subsidiary from the parent.

## I. Background[2]

WHG owns a hotel in Worcester, Massachusetts (the "Hotel").  Between 2004 and 2012,

pursuant to a Franchise Licensing Agreement ("FLA") with Hilton, *see* Krewson Decl. Ex. A,

WHG operated the Hotel as a Hampton Inn.  Consistent with that agreement, Hilton evaluated

the Hotel twice a year, using both in-person inspections and guest surveys.  In 2012, Hilton

terminated the FLA on the grounds that the Hotel had repeatedly failed its evaluations.  Hilton

then brought this suit for past fees due and liquidated damages under the FLA.

The major dispute between the parties concerns whether Hilton was within its contractual

rights in terminating the FLA.  The core of WHG's argument is that Hilton terminated the FLA

either based on a flawed evaluation process or in bad faith.  Accordingly, to decide Hilton's

motion for summary judgment, the Court has reviewed in detail, and recounts here before

addressing the parties' legal arguments, the Hampton Inn evaluation process and the events

leading up to the termination of the FLA.

---

[2] The Court's account of the facts is derived from the parties' submissions in support of and in opposition to the instant motions, including the parties' respective Local Rule 56.1 Statements (Dkt. 35 ("Pl. 56.1"), Dkt. 56 ("Def. Resp. to Pl. 56.1"), Dkt. 57 ("Def. 56.1"), and Dkt. 62 ("Pl. Resp. to Def. 56.1")); the Declarations of Georgia Krewson, Dkt. 37 ("Krewson Decl."); Jack Curtis, Dkt 38 ("Curtis Decl."); Karen Whitman, Dkt. 39 ("Whitman Decl."); Danielle Blagg, Dkt. 41 ("Blagg Decl."); Gardiner S. Barone, Dkt. 50 ("Barone Decl."); Hiren Shah, Dkt. 51 ("Shah Decl."); Stephen J. Koch, Dkt. 52 ("Koch Decl."); Sunil Nayak, Dkt. 53 ("Nayak Decl."); and Kelly McManus, Dkt. 68 ("McManus Decl."), and the exhibits attached thereto; and the Supplemental Declarations of Jack Curtis, Dkt 63 ("Curtis Supp. Decl.")

Citations to a party's 56.1 Statement incorporate by reference the documents cited therein. Where facts stated in a party's 56.1 Statement are supported by testimonial or documentary evidence, and denied by a conclusory statement by the other party without citation to conflicting testimonial or documentary evidence, the Court finds such facts to be true.  *See* S.D.N.Y. Local Rule 56.1(c) ("Each numbered paragraph in the statement of material facts set forth in the statement required to be served by the moving party will be deemed to be admitted for purposes of the motion unless specifically controverted by a correspondingly numbered paragraph in the statement required to be served by the opposing party."); *id.* at 56.1(d) ("Each statement by the movant or opponent . . . controverting any statement of material fact[ ] must be followed by citation to evidence which would be admissible, set forth as required by Fed. R. Civ. P. 56(c).").

### A.  The Hampton Inn Franchise

Hilton owns, operates, manages, and franchises hotel systems under various brands, including the Hampton Inn brand.  Pl. 56.1 ¶ 1.  There are approximately 1,800 Hampton Inn hotels in the United States.  *Id.* ¶ 9.  Hilton seeks to "create uniformity throughout the chain and provide guests of Hampton Inn hotels with an experience that is consistent, regardless of the individual hotel," by setting standards and specifications in its brand manual, requiring compliance, and retaining the contractual right to inspect every Hampton Inn hotel.  *Id.* ¶¶ 9–12.  The features that Hilton promotes as distinguishing characteristics of Hampton Inns include:

> (a) the "100% Hampton Guarantee," which promises friendly service, clean rooms, and comfortable surroundings, or the guest stay is free; (b) a clean and fresh HAMPTON bed, with a premium pillow-top mattress, a plush comforter, a crisp white duvet washed fresh for every guest, and comfortable pillows; (c) a free, hot breakfast, including fresh-baked waffles, cereals, yogurt, fruit and more; (d) free high-speed Internet access in all guest rooms, the lobby, and meeting rooms; (e) a fully-equipped fitness room; (f) a lap desk to work from the bed or sofa; (g) a simple alarm clock with preprogrammed radio buttons for different music genres; (h) a curved shower curtain rod; and (i) a business center with computers and printers.

*Id.* ¶ 5.

### B.  The Quality Assurance Process

Hilton regularly inspects every Hampton Inn hotel by conducting unannounced "Quality Assurance Evaluations" on a semi-annual basis.  *Id.* ¶ 14.  The inspector "audits all aspects of the hotel operation," reviewing hotel paperwork, walking through the entire property, and inspecting 12 guest rooms, nine of which have been cleaned since check-out and three of which have not.  *Id.* ¶¶ 15, 17–19.  The inspector takes photographs to document problems, records his or her findings, and immediately discusses his or her findings with hotel management.  *Id.* ¶¶ 16, 21.

Hilton uses the evaluation to score the hotel at issue on compliance with brand standards, cleanliness, and the physical condition of the hotel.  *Id.* ¶ 22.  Hilton's complex scoring process,

best described as baroque, appears to work as follows.[3]  There are three main categories: brand

standards, commercial facilities, and guest rooms.  *See generally* Curtis Decl. Exs. A–G; Bragg

Decl. Exs. A–E.  Each category has a number of subcategories, as follows:

Brand Standards:
1.  Approved Products (250 points)
2.  Breakfast Bar/Beverage Service (1,000)
3.  Front Desk and Related Services (250)
4.  Major Rules (1,000)
5.  Support Rules (250)
6.  Training Documentation (250)

Commercial Facilities:
1.  Back-of-the-House (250)
2.  Breakfast Bar/Lobby Area (500)
3.  Corridors/Elevators/Stairwells (250)
4.  Entrance/Registration Area/Front Desk (250)
5.  Exterior Components (500)
6.  Meeting Rooms and Boardroom (250)
7.  Public Restrooms (250)
8.  Recreation Facilities (250

Guest Rooms
1.  Bathrooms (500)
2.  Bedrooms (500)
3.  Individual Room Failures (500)

Each category begins with a value of 1,000 points.  The point value for each main category is

calculated by subtracting from 1,000 the number of points lost in each of its subcategories.  For

example, if a hotel received a score of 450 (out of 500) in each of the bathrooms, bedrooms, and

individual room subcategories, then its score on the guest room category would be 850.  The

points for each of the three main categories are then added together to yield a "Quality Assurance

Index Score"; the maximum such score is thus 3,000 points.  This score is then converted into a

percentage (*e.g.,* a score of 2,700 points would translate to a 90% score).  That percentage score

---

[3] Hilton's brief and accompanying materials are less than fully pellucid in describing the scoring system.  The Court has examined the evaluations in the record before it to make inferences about how to accurately describe the scoring process.

is then multiplied by a specific "multiplier" to yield a "Final Score." A hotel receives an "Unacceptable" rating and fails the evaluation if its Final Score is below 75%. Pl. 56.1 ¶ 25.

As for the multiplier that Hilton applies to a hotel's Final Score, it can be 100%, 89.99%, or 74.99%. If the multiplier is 74.99%, the hotel necessarily fails the evaluation, because even if the hotel had received 100% of the points possible on the Quality Assurance Index Score, once that 100% is multiplied by 74.99%, its Final Score will be below the 75% required to pass. If the multiplier is 89.99%, then a Quality Assurance Index Score of 83 percent or lower, which would otherwise be a passing score, will, when multiplied by 89.99% become a failing Final Score of below 75%. If the multiplier is 100%, then the Quality Assurance Index Score is unchanged.

A hotel receives a multiplier of 74.99%, and therefore automatically fails the overall evaluation, if it (1) fails a main area[4] (*i.e.*, receives less than 75% of the available points), *see, e.g.*, Curtis Decl. Ex. C; Blagg Decl. Exs. A, D; (2) fails two or more sub-areas (*i.e.*, receives less than 75% of the available points), *see, e.g.*, Blagg Decl. Ex. D; (3) receives a score in the Unacceptable range on the "overall service" question on the guest survey, *see, e.g.*, Curtis Decl. Exs. D, E; Blagg Decl. Exs. A, C, E, G; or (4) receives a score in the Unacceptable range on the "overall guest room cleanliness" question on the guest survey, *see, e.g.*, Blagg Decl. Exs. E, G. A hotel (assuming it is not required to receive a multiplier of 74.99%) receives a multiplier of 89.99%, and therefore will fail the overall evaluation if its Quality Assurance Index Score is

---

[4] On the record presented to the Court, it is not entirely clear whether the "main areas" are brand standards, commercial facilities, and guest rooms, which are each graded on a 1,000-point scale, or whether they are cleanliness, condition, and standards, the grades for which are expressed in percentage terms. The Declaration of Danielle Blagg states that the Main Areas are Cleanliness, Condition, and Standards, and that a hotel can fail an evaluation as a result of receiving an Unacceptable score in one of these areas. Blagg Decl. ¶¶ 17–18. But the face of a number of evaluations show that the hotel at issue here received an Unacceptable score on one or more of Cleanliness, Condition, and Standards, but is not listed as having failed a main area. Blagg Decl. Exs. C, E; *see also infra* n.6.

below 83%, if it has: (1) performed below a certain minimum threshold on "overall graded issues," *see, e.g.*, Curtis Decl. Ex. C, Blagg Decl. Ex. D, the meaning of which is unclear; (2) receives a score in the Acceptable range on the "overall service" question on the guest survey, *see, e.g.*, Curtis Decl. Exs. A, B, C; Blagg Decl. Ex. B, D; (3) has a "guest room / suite deficiency or room failure," *see, e.g.*, Curtis Decl. Exs. A, E; Blagg Decl. Exs. A, C, D, E, G, (4) failed a sub-area (*i.e.*, receives less than 75% of the available points), *see, e.g.*, Curtis Decl. Exs. A, C; Blagg Decl. Exs. A, C, D, E, G, or (5) receives a score in the Acceptable range on the "overall guest room cleanliness" question on the guest survey, *see, e.g.*, Blagg Decl. Ex. D.  A hotel receives a 100% multiplier if nothing would cause it to receive a 74.99% or 89.99% multiplier.

The guest surveys, which Hilton refers to as Service and Loyalty Tracking ("SALT") surveys, are sent to guests after their stay at the hotel.  Pl. 56.1 ¶¶ 29–30.  Hilton has used the SALT survey for its entire family of hotels for the past 11 years.  McManus Decl. ¶ 3.  The SALT questionnaires ask the guest to rate the hotel on a scale from one to 10 on items such as lobby appearance, helpfulness of the staff, cleanliness of their room, and their overall experience. Pl. 56.1 ¶ 31.  To compute SALT scores, Hilton uses the Top 2 Box Methodology, which it states is a "generally accepted methodology for consumer satisfaction and customer loyalty surveys." McManus Decl. ¶ 11.  The SALT score for a question is calculated by taking the number of guests who gave a rating of 9 or 10 and dividing it by the number of responses to that question. *Id.*  For example, if 30% of responses to the overall experience question were a "10" and 40% of responses were a "9," the SALT score for overall experience would be 70%.  Hilton aims to receive 40 to 50 SALT responses per month for each Hampton Inn hotel, *id.* ¶ 8, and uses

approximately the past six months' worth of data in aggregating SALT scores for the semi-annual evaluations, *id.* ¶ 17.

### C.  The Hotel Before 2004

The Hotel was built in 1984.  Shah Decl. ¶ 15.  It is a five-story building, with two elevators, situated on a small commercial lot in Worcester, Massachusetts.  *Id.*  It is located across the street from an arena called the DCU Center, which is a major local attraction, and the Worcester Medical Center.  *Id.*  It was initially operated as a Best Western hotel.  *Id.* ¶ 17.  According to WHG, the initial construction of the hotel "provided affordable accommodations in a lackluster and monotonous building" with "sparse amenities."  *Id.* ¶ 18.  The original owner of the hotel was Meyers/Jabara, a substantial owner and operator of hotels.  *Id.* ¶ 31; Barone Decl. Ex. A at 7.

In 1990, HLT's predecessor, Promus Hotels, Inc.,[5] accepted the Hotel into the Hampton Inn network as one of Hampton Inn's first "conversions."  Shah Decl. ¶ 19; Krewson Decl. ¶ 15; Barone Decl. Ex. A at 7.  The agreement required Meyers/Jabara to implement a Product Improvement Plan by which it would make certain renovations in order to meet Hampton Inn's standards.  Shah Decl. ¶¶ 20–21.  Promus also granted Meyers/Jabara a number of waivers from the Hampton Inn standards, including the requirement of a swimming pool, because the Hotel was not initially built as a Hampton Inn and had certain design and layout limitations.  *Id.* ¶ 21; Barone Decl. Ex. A at 7.

---

[5] On October 24, 2007, Promus, a subsidiary of HWI, assigned its existing franchise license agreements, including the FLA at issue here, to HLT.  Pl. 56.1 ¶ 43.  HLT is the current franchisor and party, with WHG, to the FLA.  *Id.*

### D.  The 2004 Franchise Licensing Agreement

In 2004, WHG purchased the Hotel from Meyers/Jabara.  Shah Decl. ¶ 29.  Promus consented to the purchase.  *Id.*

In connection with WHG's purchase of the Hotel, WHG and Promus entered into the FLA, effective August 13, 2004.  *See* FLA Ex. A; *see also* Pl. 56.1 ¶ 38; Shah Decl. ¶ 29.  The FLA grants WHG a non-exclusive license to operate the Hotel according to the "System," *i.e.*, as a Hampton Inn, for a 16-year period unless earlier terminated pursuant to the terms of the FLA. FLA § 2, Attachment B-1.  The FLA, which defines "we" to mean the licensor (Hilton) and "you" to mean the licensee (WHG), *id.* p. 1, defines the "System" as follows:

> The "System" is the elements we designate from time to time to identify hotels operating under the Licensed Brand that provides to the consuming public a similar, distinctive, high quality hotel service. . . .  The System currently includes the Licensed Brand and the Marks; access to a reservation system; advertising, publicity and other marketing programs and materials; training programs and materials, standards, specifications and policies for construction, furnishing, operation, appearance and service of the Hotel, we refer to in this Agreement or in the Manual and programs for our inspecting the Hotel and consulting with you. We may add elements to the System or modify, alter or delete elements of the System at our sole discretion.

*Id.* § 1(c).  The FLA also defines the term "Manual," as follows:

> References to the "Manual" will include all written standards and requirement we adopt from time for constructing, equipping, furnishing, supplying, operating, maintaining and marketing System hotels.  Changes made in the Manual will apply to System hotels as specified and may not apply to all System hotels.  We may set forth these standards and requirements in one or more documents or guides.  All of these items, as we modify them from time to time, will be considered the Manual.  We will change the Manual from time to time.  We will notify you at least thirty (30) days before any change becomes effective.  You will be responsible for the costs of complying with the Manual, including any changes.

*Id.* § 1(d).

The FLA places certain responsibilities on the licensor, *id.* § 3, and the licensee, *id.* § 6. Relevant here, the obligations on the licensee include that it will:

8

- "[O]perate, furnish, maintain and equip the Hotel in a clean, safe and orderly manner and in first-class conditions in accordance with the provisions of this Agreement and the Manual." *Id.* § 6(a)(3).
- "[P]rovide efficient, courteous and high-quality service to the public." *Id.* § 6(a)(4).
- "[A]dopt, use and comply with the standards, requirements, services, products, programs, materials, specifications, policies, methods, procedures, and techniques set forth in the Manual, as it may be amended by us from time to time, and keep your Manual current at all times." *Id.* § 6(a)(5).
- "[C]omply with System standards, specifications and requirements as to the types and levels of services, amenities and products that either must or may be used, promoted or offered at or in connection with the Hotel." *Id.* § 6(a)(7).
- "[P]articipate in . . . all required System quality assurance programs . . . and maintain minimum performance standards and scores for such quality assurance programs that we may establish from time to time in the Manual." *Id.* § 6(a)(12).
- "[C]omply with System standards, specifications and requirements as to maintenance, appearance and condition of the Hotel, and adopt in your business all changes or additions to the System as we may periodically designate." *Id.* § 6(a)(13).
- "[P]ermit inspections of the Hotel by our representatives at any time to ensure compliance with System standards, cooperate fully with our representatives during these inspections and take all steps necessary to correct any deficiencies detected within the time periods we specify." *Id.* § 6(a)(17).
- Pay a Monthly Royalty Fee and a Monthly Program Fee, each in the amount of 4% of the Hotel's Gross Rooms Revenue for the preceding calendar month. *Id.* § 7(a), Attachment B-1.
- Complete certain renovations over a two year period. *Id.* Ex. A.

The FLA also states, in a paragraph entitled Inspections/Compliance Assistance:

> We will administer a quality assurance program for the System which may include conducting periodic inspections of the Hotel and guest satisfaction surveys and audits to ensure compliance with System standards. We have the right to inspect the Hotels and its operations at any time, with or without prior notice to you, and to determine if the Hotel is in compliance with the standards and rules of operation set forth in this Agreement and in the Manual. If the Hotels fails to comply with such standards and rules of operation, we may, at our option and at your cost, require an action plan to correct the deficiencies. You must then take all steps necessary to correct any deficiencies within the times we establish.

*Id.* § 3(e). The FLA further provides, in a paragraph entitled Quality Assurance:

> We may from time to time require you to modernize, rehabilitate and/or upgrade the Hotel's fixtures, equipment, furnishings, furniture, signs, computer hardware and software and related equipment, supplies and other items to meet the then-current standards and specifications specified in the Manual. . . . We may make

limited exceptions to some of those standards based on local conditions or special circumstances, but we are not required to do so.

*Id.* § 6(b).  The FLA gives Hilton the right to terminate the FLA if WHG fails to cure a default within 30 days of being given notice.  *Id.* § 14(a).  It also gives Hilton the right to terminate the FLA immediately for repeated noncompliance.  *Id.* § 14(b).  The FLA also states that if Hilton terminates the FLA pursuant to section 14(a) or 14(b), the WHG must pay Hilton:

> a lump-sum payment equal to the sum of the following:  (i) all amounts owed to us for periods prior to the date of termination, plus (ii) as liquidated damages for the future Monthly Royalty Fees and Monthly Program Fees we will lose, a "Termination Fee" determined by multiplying the average of the Monthly Royalty Fees and Monthly Program Fees . . . with respect to the Hotel for the twenty-four (24) month period immediately preceding the month of termination, by thirty-six (36), or by such lesser multiple as would represent the remaining full or partial months between the date of termination and the expiration of the License Term.

Id. § 14(c).  Finally, the FLA specifies that, with exceptions not relevant here, New York law shall govern the parties' dealings, and any disputes shall be litigated in New York City.  *Id.* § 16(b).

### E.  Events Between 2004 and 2011

In 2004, after the FLA was signed, WHG began its two-year renovation of the Hotel according to the FLA's Product Improvement Plan (PIP).  *See* FLA Ex. A.  The renovations ultimately cost WHG more than $700,000.  Shah Decl. ¶ 32.

The Hotel failed its next four Quality Assurance Evaluations, all of which occurred during the renovation process, on October 7, 2004, July 13, 2005, November 15, 2005, and May 12, 2006.  Koch Decl. ¶ 23.  On all four, the Hotel failed the relevant SALT portion of the evaluation, while performing well on Cleanliness and Standards.  *Id.*  Except for the November 15, 2005 evaluation, the Hotel also scored poorly on Conditions.  *Id.*

Beginning in fall 2005, WHG's principal owner, Sunil Nayak, began asking Hilton whether it would approve a sale and relicensing of the Hotel.  Pl. 56.1 ¶ 71.  On November 30, 2005, Robert Giardino, the Director of Franchise Re-Licensing at Hilton Hotels Corporation, emailed colleagues to inform them that the Hotel was for sale.  Barone Decl. Ex. A at 27.  He informed them that "[w]e will consider re-licensing this property with a new owner for the remainder of the current term to expire September 18, 2020," and asked them to "share your concerns and comments."  *Id.*  He received the following responses:

> David Kerekes:  Tends to be slow but generally okay.  A new owner would be a good thing.

> Karen Whitman (Director, Franchise Development, Northeast Region):  This hotel has an "A" location in downtown Worcester.  Despite its location, it has always been plagued by product problems.  It was in default for awhile and a "special" exception was planned for last month.  If the product has been brought up to standard, it should represent Hampton well in the market.

> Heidi Garrett:  I agree with Karen.  The hotel had their special inspection on the 15th of November and although they did not pass due to SALT scores, all current PIP items had been addressed and there were no major operational issues.  The hotel looks much better and I think with the remaining PIP items that need to be completed by April [2006], it should address most of the product issues this hotel has had.  This hotel was a conversion.  Some unique items are that the breakfast area is on the second floor and they do not have a pool.

> Kenny Pyron (Vice President of Franchise Re-Licensing):  We'll still pip it again.

*Id.* at 25.

On August 31, 2006, the Hotel passed its Quality Assurance evaluation.  Koch Decl. ¶ 23.  Shortly thereafter, the Hotel completed its renovations.  *Id.*

In October 2006, Nayak again asked Hilton about selling the Hotel.  Pl. 56.1 ¶ 72.  On October 11, 2006, Giardino again emailed his colleagues, this time with an email marked High Importance, noting that the Hotel was for sale and informing them that he "anticipate[d] that we will re-license the hotel with a new owner for the remainder of the current term which expires

September 18, 2020.  The potential buyer is Shalinder Nichani."  Barone Decl. Ex. A at 24.

Giardino asked his colleagues to "share your comments/concerns."  *Id.*  He received the

following responses:

> David Motta: Market Analysis has never been impressed w/this converted facility.
> Good location but seems to have been plagued by so-so management.  We'd like
> to hear if Development believes it could be replaced within the next few years or
> if HPS thinks its nightmarish Q/A track record can be reversed.
>
> Larry Letter (Director of Product & Service – NE Region, Hampton Brand
> Management): HPS would like to see this hotel replaced if possible.  It recently
> passed a Special, but has many layout issues.  The breakfast area is on the second
> floor and has very limited seating.   Several other areas have operational
> shortcomings.  A new HGI is scheduled to open in the same vicinity shortly.
>
> Phil Cordell:   The sooner it can transition out, the better.   Never a good
> conversion hotel.  Even after recent refurbishment.
>
> Karen Whitman:  Although this hotel has a fabulous location and will be difficult
> to replace, it is probably worth trying.  This was one of the first conversions ever
> done by Hampton and has never represented the brand particularly well.  I am
> inclined to say let's attempt to replace.  It may take awhile but the HI Auburn is
> located 10 minutes away and the HGI is supposed to open next week.
>
> Craig Mance:  I was at the property last week.  Good location, but underwhelming
> asset.  I agree with Karen[.]

*Id.* at 21–24.  Apparently as a result of these assessments, Hilton informed Nayak that it would

not relicense the hotel to a new owner "due to the age of the hotel, layout issues, operational

shortcomings, and a history at that time of failed Quality Assurance Evaluations."  Pl. 56.1 ¶ 72.

On January 31, 2007, the Hotel passed its evaluation, performed by James Burke, with an

Acceptable score of 84.48%, although it received an Unacceptable score of 73.54% on the

bedroom sub-area.  Curtis Decl. Ex. A at 1.  The Hotel received a Cleanliness score of 99.55%, a

Standards score of 100%, and a Condition score of 82.10%.  *Id.*

On February 15, 2007, Giardino emailed his colleagues:  "Back in 2007 we told this

owner that we would not re-license the above hotel if sold.  I have been approached by Nick

Gandhi who is asking us to consider a 5 year term (full fees/huge PIP) which I think we should consider.  The existing FLA expires 09/18/2020, by offering a five year term we would be cutting 8 years off the existing license.  Please let me know what you think."  Barone Decl. Ex. A at 19.  Phil Cordell responded, "OK with me, but it needs to be a HUGE PIP.  It's one of our initial conversions that never quite 'fit' – hate to keep it around IF it can't become an 'A Hampton.'"  *Id.*

On July 26, 2007, the Hotel passed its evaluation, again performed by Burke, with an Acceptable score of 85.62%.  Curtis Decl. Ex. B at 1.  All sub-areas received scores that were in the Outstanding range.  *Id.*  The Hotel received a Cleanliness score of 96.92%, a Standards score of 100%, and a Condition score of 88.51%.  *Id.*

In November 2007, Nayak asked Giardino to reconsider Hilton's refusal to relicense the Hotel.  *See* Barone Decl. Ex. A at 17.  Giardino then emailed his colleagues:  "I spoke with Sunil [Nayak] today and he asked us to consider re-licensing the hotel with a new owner.  Last year we told him no in hopes that poor QA/SALT would get the hotel removed, but it didn't.  I would [sic] to offer a 5 year term with PIP.  By doing so we will cut 7 years off the license and get Sunil out of the property.  Please let me know your thoughts."  *Id.*  He received the following responses:

> David Motta:  Not sure I understand all the options, but I'd recommend cutting this hotel loose as soon as we can.  As I recall, this converted facility has just been a challenge to operate as a Hampton Inn.  Recognizing the difficulties involved in developing in that area, nonetheless, I would like to think we could reposition the brand there.
>
> Phil Cordell:  Based on my knowledge of this hotel, the sooner we can transition it out of the system, the better.
>
> Karen Whitman:  I agree with Phil.  We need to get this hotel out of the system as soon as possible.  This was one of the very first conversions Hampton did and was a good example of how NOT to do conversions.  There were many waivers

13

granted and this hotel has never represented the brand well.  It is however, a great location.  We do need to try and reposition in this market.

Craig Mance:  [A]gree with Karen . . . and I know Karen can replace this :)

*Id.* at 14–17.  Giardino then told his colleagues that he would "offer 3 [years] limited PIP or 5 years full PIP to expedite its departure."  *Id.* at 14.

On January 22, 2008, the Hotel failed its evaluation, again performed by Burke, with an Unacceptable score of 63.61%.  Curtis Decl. Ex. C at 1.  It failed because it received an Unacceptable score of 71.52% on the Standards area of the evaluation, in which it lost points because it did not have bed frames that complied with the Americans with Disabilities Act and because its new manager had not been certified in the required training programs.  *Id.* at 1–2; Curtis Decl. ¶ 25; Curtis Supp. Decl. ¶ 9.

On July 15, 2008, the Hotel again failed its evaluation, performed by Burke, with an Unacceptable score of 70.39%.  Curtis Decl. Ex. D at 1.  The Hotel received an overall score of 93.87%, in the Outstanding range.  *Id.*  It failed the evaluation, however, because it received an Unacceptable score of 52.7% for "overall service" on the SALT survey, 21.8 points below the average for Hampton Inn hotels.  *Id.* at 1–2.  The Hotel received a Cleanliness score of 98.60%, a Standards score of 99.68%, and a Condition score of 83.34%.  *Id.* at 1.

In early 2009, Nayak sold a minority interest in WHG to Global Vision Hospitality ("Global Vision"), which then began to manage the Hotel.  Pl. 56.1 ¶ 98.  Hilton was not required to consent to the sale because the sale did not result in a change of control.  *Id.* ¶ 99.

On February 10, 2009, the Hotel failed its evaluation, this time performed by Sue DeMilly, with an Unacceptable score of 67.33%.  Curtis Decl. Ex. E at 1.  As with the previous evaluation, the Hotel did well on the inspection-based portions of the evaluation, achieving a Quality Assurance Index Score of 89.78%, just below the Outstanding range, but failed because

14

of its "overall service" score on the SALT, which, at 61.5%, was just below the minimum Acceptable score of 63%.  *Id.* at 1–2.  The Hotel received a Cleanliness score of 99.37%, a Standards score of 94.16%, and a Condition score of 75.81%.  *Id.* at 1.

In October 2009, HLT determined that someone associated with the Hotel had manipulated SALT scores.  Curtis Decl. ¶ 37.  This triggered an Administrative Evaluation on October 19, 2009, which the Hotel failed, apparently as a result of this rules violation.  *Id.*; Curtis Decl. Ex. F at 1.  The employee suspected of manipulating the SALT scores was terminated. Koch Decl. ¶ 45.

On October 29, 2009, the Hotel again failed its evaluation, this time performed by Danielle Blagg, with an Unacceptable score of 61.87%.  Blagg Decl. Ex. A at 1.  The Hotel failed the evaluation because it received an Unacceptable score of 71.18% on Standards, *id.*, "as a result of deductions for failure to have properly trained staff and to follow required protocols regarding HVAC settings, check-in, and required elements of breakfast area," Blagg Decl. ¶ 5. The Hotel also received an Unacceptable score of 74.4% in the corridors/elevators/stairwells sub-area "because the corridor exit doors did not self-latch, the door closure was not connected, the back hallway door was missing the required 6" reflective 'EXIT' lettering and items were stored in a stairwell, blocking a door."  *Id.* ¶ 6.  Additionally, the evaluation states, and Hilton represents, that the Hotel received a failing grade on the "overall service" portion of the SALT survey, Blagg Decl. ¶ 9 & Ex. A at 1, but the record contains contradictory information:  The Hotel received a 63.8% on overall service, which according to the chart on the second page of the evaluation was then a passing score.  Blagg Decl. Ex. A at 2.  The Hotel received a score of 92.37% on Cleanliness and 83.98% on Conditions.  *Id.* at 1.

In December 2009, Nayak asked Giardino about selling his interest in the Hotel to Global Vision, which would trigger a change of ownership.  Barone Decl. Ex. A at 13; *see also* Pl. 56.1 ¶ 118.  On December 3, 2009, Giardino emailed his colleagues about this request, writing: "Based on the hotel[']s performance and prototype (former Best Western), my recommendation is to let the QA process terminate the hotel.  If the brand does not think this will happen, then perhaps we should consider a 5 year term with PIP or 3 year term without a PIP to help expedite its departure.  Thoughts?"  Barone Decl. Ex. A at 13.  He received the following responses:

> Jack Curtis (Director of Quality Assurance):  I agree that you allow the QA process to terminate the hotel.  This hotel is scheduled to come to QA committee next week and the recommendation from a QA standpoint will be to issue a NODT.  The hotel has had five consecutive unacceptable evaluations mainly due to poor SALT scores and brand standards violations.

> David Motta:  Market Analysis concurs.  Plus it's a goofy hotel from Day One – a real problem as well.

> Karen Whitman:  I definitely agree to allow the QA process to terminate the hotel.  This hotel has always suffered from product issues.  We have a fairly new HI located in Auburn (approximately 5 miles away) which will benefit from the extra Hampton business until such time as the market improves and we can replace downtown Worcester with a new Hampton product.

> Kurt Smith:  Agreed.

> Georgia Krewson:  Looks like we are on the same page.

*Id.* at 9, 12.  Giardino then informed his colleagues that he would "let [Nayak] know that we will not consider re-licensing until the hotel is in good standing with the brand (passing multiple QA's, SALT at or above system average, etc.).  If they are unable to accomplish this, then I will circle back to discuss a short term agreement to help expedite its departure."  *Id.* at 9.

On March 18, 2010, the Hotel passed its evaluation, again performed by Blagg, with an Acceptable score of 81.75%.  Blagg Decl. Ex. B at 1.  This was the first evaluation that the Hotel had passed since July 26, 2007.  The Hotel's "overall service" score on the SALT survey was

65.3%, or 2.3 percentage points above the minimum level for an Acceptable score and 9.5

percentage points below the average for Hampton Inn hotels.  *Id.* at 2.  The Hotel received a

score of 98.73% for Cleanliness, 96.35% for Standards, and 77.43% for Condition.  *Id.* at 1.

On August 26, 2010, the Hotel failed its evaluation, again performed by Blagg, with an

Unacceptable score of 65.6%.  Blagg Decl. Ex. C at 1.  The Hotel received a score of 99.44% for

Cleanliness, a score of 94.42% for Standards, and a score of 71.95% for Condition.  As with the

October 29, 2009 evaluation, the Hotel received an Unacceptable score in the

corridors/elevators/stairwells sub-area "because an exterior door did not latch and the closure

was not connected."  Blagg Decl. ¶ 15.  It also received an Unacceptable score in the back-of-

the-house and lobby/breakfast sub-areas.[6]  *Id.*

In October 2010, Global Vision again approached Hilton about buying the Hotel.  Pl.

56.1 ¶ 133.  On October 15, 2010, Hilton's Phil Cordell emailed colleagues to ask if there was

any reason to reconsider their previous rejection of relicensing by a new owner.  Barone Decl.

Ex. A at 7.  He received the following responses:

---

[6] The record is somewhat opaque as to exactly why the Hotel failed this particular evaluation.
The Hotel received a score of 64.2% on the "overall service" component of the SALT survey, *id.*
at 2, which was a passing score according to the chart included with the evaluation, *id.*, and
according to an HLT declaration, Blagg Decl. ¶ 16.  But the face of the evaluation indicates that
HLT failed because it failed the overall service portion of the SALT survey:  the "Multipliers"
section of the evaluation states that the Hotel received a multiplier of 74.99% for "Overall
Service SALT," Blagg Decl. Ex. C at 1, which guarantees a failing overall grade and is only
supposed to happen when the Hotel fails the overall service component of the SALT.  Ms.
Blagg's declaration, by contrast, states that Hotel failed because it received an Unacceptable
score for Condition, which she identifies as one of the three Main Areas.  Blagg Decl. ¶ 17.
Although the face of the evaluation states that the Hotel received an Unacceptable score on
Condition, 71.95%, the "Multipliers" section of the evaluation indicates that the Hotel did not
fail a Main Area, *see* Blagg Decl. Ex. C at 1, and at least one other evaluation indicates that
Condition is not a Main Area, *see* Blagg Decl. Ex. E (showing that the Hotel received an
Unacceptable score on Condition, as well as Cleanliness, but did not "fail" a "main area.").  *See
generally supra* n.4.

Robert Giardino:  [F]ormer days in conversion in the wrong part of town – below in all categories – failed three of the last four QAs.  Global invested capital with Sunil N[a]yak and assumed they would be able to take over the hotel.  This one is a definite "NO."

Karen Whitman:  I agree with Robert . . . this is a definite no.  This was one of the first conversions ever done and Ray Schultz granted many waivers due to the pressure he received from Meyers/Jabara, the original owner.  I have recently met with Gautham Sharma, Stephen Koch's partner [at Global Vision] and encouraged him to redevelop.  There are other opportunities in the market.  I will call Stephen Koch this week and let you know when the loop is closed.

Thomas Lorenzo:  Thanks and I agree 100%.

*Id.*  Hilton then encouraged Global Vision to develop a new Hampton Inn in Worcester to replace the existing one.  Pl. 56.1 ¶ 135.  However, after these discussions, which occurred in or about October 2010, neither WHG nor Global Vision approached HLT about developing a new Hampton Inn in Worcester.  *Id.* ¶ 136.

In November 2010, HLT again determined that someone associated with the Hotel had manipulated the SALT scores.  Curtis Decl. ¶ 41.  This triggered an Administrative Evaluation on November 19, 2010, which the Hotel failed, apparently as a result of this rules violation.  *Id.*; Curtis Decl. Ex. G at 1.  According to WHG, HLT did not contact the person who allegedly submitted the fraudulent survey results in order to confirm its suspicions.  Koch Decl. ¶ 54.

In December 2010, Stebbins & Schleicher Hotels, LLC ("SSH"), a franchisee of HLT's, approached Hilton about eight hotel development projects in New England, including one in Worcester, MA.  Pl. 56.1 ¶ 138.  At the time, Hilton did not pursue these discussions.  *Id.* ¶ 139.

On February 9, 2011, the Hotel failed its evaluation, again performed by Blagg, with an Unacceptable score of 56.67%.  Blagg Decl. Ex. D at 1.  This time, the Hotel received a passing score of 65.3% on the "overall service" portion of the SALT survey.  *Id.* at 2.  According to Blagg's declaration, the Hotel failed the evaluation because she gave it Unacceptable scores of

72.0% on Condition and 67.78% on Standards, such that it failed in two main areas.  Blagg Decl.
¶ 18; *see also* Blagg Decl. Ex. D at 1.  The evaluation also reflects that the Hotel failed in two
sub-areas, "major rules" and "support rules."  Blagg Decl. Ex. D at 1.  The Hotel's cleanliness
score was lower than previous evaluations, at 81.11%.  *Id.*  The Hotel nearly received a failing
score for the corridors/elevators/stairwells sub-area, because the "the reflective 'EXIT' lettering
was removed from an exterior door and an electrical panel was unlocked overnight."  Blagg
Decl. ¶ 21.  The Hotel also nearly received a failing score on the breakfast bar/lobby sub-area
because, "among other issues, the sofas, chairs and tables were worn, faded, chipped, and
stained." *Id.*  These issues had been noted in the previous four inspections, in February 2009,
October 2009, March 2010, and August 2010.  *Id.  See generally* Blagg Decl. ¶¶ 18–24.

After the February 2011 inspection, the Hotel renovated the lobby and breakfast area to
conform to Hampton Inn's "Perfect Mix Lobby" standards.  Koch Decl. ¶ 59.  However, the
Hotel was unable to move its breakfast area to the first floor, as the standards provide, because of
limitations created by structural supports and elevator shafts.  *Id.*

### F.  Hilton's April 2011 Notice of Default, and the Events Until May 2012

On April 1, 2011, Hilton's corporate counsel sent WHG a Notice of Default and
Opportunity to Cure.  Krewson Decl. Ex. B.  The Notice informed WHG that it was "in default
of the terms of the License Agreement as a result of its failure to comply with required Hampton
Inn brand and product quality standards as detailed in the February 9, 2011 Quality Assurance
Evaluation for the Hotel."  *Id.*  The Notice further informed WHG that, to avoid termination of
the FLA on September 1, 2011, it would have to "receive[ ] an overall 'Acceptable' score on the
Special Product Evaluation scheduled for July 26, 2011."  *Id.*  The Notice was sent in the manner
required by FLA § 16(f).  Pl. 56.1 ¶ 152.

On April 13, 2011, SSH told Whitman that it was preparing two applications, one of which was for a Hampton Inn & Suites in Worcester.  Barone Decl. Ex. A at 2; Pl. 56.1 ¶ 157. The next day, Whitman told a colleague that this proposed Hampton Inn "will replace that awful existing [Hampton Inn]."  Barone Decl. Ex. A at 2.  SSH did not submit an application at that time.  Whitman Decl. ¶ 9.

In June 2011, WHG requested that Hilton extend the cure period and reschedule the July 26, 2011 evaluation to give WHG time to complete its lobby renovations and raise its SALT scores.  *Id.* ¶ 159.  Hilton agreed and sent WHG a letter rescheduling the evaluation for September 28, 2011 and extending the cure period accordingly.  Krewson Decl. Ex. C.  The Notice was sent in the manner required by FLA § 16(f).  Pl. 56.1 ¶ 162.

In September 2011, SSH proposed developing a Hampton Inn & Suites or a Homewood Suites in Worcester, at a different site than previously discussed.  Whitman Decl. ¶ 10.  Whitman responded that HWI would consider the Homewood Suites, but, because of WHG's Hotel, she was noncommittal on the proposed Hampton Inn & Suites.  *Id.*  SSH did not submit an application regarding either hotel at that time.  *Id.*

On September 28, 2011, the Hotel failed its evaluation, performed by Blagg, with an Unacceptable score of 65.51%.  Blagg Decl. Ex. E at 1.  The Hotel received Unacceptable scores of 74.17% on Cleanliness and 64.06% on Condition, although its Standards score, 99.12%, was nearly perfect.  *Id.*  The Hotel failed because it received Unacceptable scores on the overall service (62.9%) and guest-room cleanliness (60.1%) of the SALT.  *Id.* at 2; *see also* Blagg Decl. ¶¶ 25–29.

Hilton decided not to terminate the FLA on November 1, 2011, as its previous letter had indicated it would do, but instead to grant WHG a further opportunity to cure.  Krewson Decl.

20

¶ 29.  Accordingly, on October 14, 2011, Hilton's corporate counsel sent WHG a letter stating that if WHG did not receive a passing score on the evaluation scheduled for April 17, 2012, Hilton would terminate the FLA effective June 1, 2012.  Krewson Decl. Ex. D.

On April 17, 2012, the Hotel failed its evaluation, performed by Blagg, with an Unacceptable score of 64.31%.  Blagg Decl. Ex. G at 1.  The Hotel received scores of 73.45% for Cleanliness, 99.75% for Standards, and 59.13% for Condition.  *Id.*  It failed because it received Unacceptable scores on the overall service (63.4%) and guest room cleanliness (58.5%) of the SALT.  *Id.* at 2; *see also* Blagg Decl. ¶¶ 30–34.

### G.  Hilton's May 2012 Notice of Termination

On May 16, 2012, Hilton's corporate counsel sent WHG a Notice of Termination, effective August 31, 2012.  Krewson Decl. Ex. E.  The Notice recited that HWI had told WHG on April 1, 2011 that it was "in default of the terms of the License Agreement as a result of its failure to comply with required Hampton Inn brand and product quality standards," that Hilton had given WHG "multiple opportunities and extensions of time to cure this default," and that the Hotel had failed to achieve an Acceptable score on the April 17, 2012 evaluation, thereby failing to cure by the final deadline.  *Id.*  The Notice was sent in the manner required by FLA § 16(f).  Pl. 56.1 ¶ 194.

Whitman then contacted SSH about the Hampton Inn & Suites that SSH had previously proposed developing in Worcester.  Whitman Decl. ¶ 11.  On June 14, 2012, SSH submitted an application to build that hotel.  *Id.* ¶ 12.  After a market study, it submitted an amended application.  *Id.*  On January 9, 2013, Hilton approved the amended application.  *Id.*  On August 14, 2013, SSH and Hilton executed an FLA.  *Id.*  ¶ 13.  As of September 30, 2013, when plaintiff

filed its motion for summary judgment and accompanying documents, construction had not yet begun, and Hilton projected that the hotel would open in late 2015. *Id.*

### H.  Procedural Background

On November 14, 2012, Hilton filed a complaint against WHG for past-due fees, liquidated damages, and attorneys' fees and costs, as provided for in the FLA.  Dkt. 1.  On January 30, 2013, WHG answered and filed a counterclaim.  Dkt. 4.  On April 1, 2013, Hilton filed an amended complaint, again seeking past-due fees, liquidated damages, and attorneys' fees and costs, as provided for in the FLA.  Dkt. 15.  On April 11, 2013, WHG answered and again asserted its counterclaim for money it spent on renovations and on re-identifying the Hotel with a new brand after termination.  Dkt. 16.

On September 30, 2013, Hilton filed a motion for summary judgment, Dkt. 33, and an accompanying memorandum of law, Dkt. 34 ("Pl. Br.").  On October 30, 2013, WHG filed an opposition, Dkt. 49 ("Def. Br.").  That same day, WHG moved to strike the SALT survey data from plaintiff's moving papers as inadmissible hearsay, Dkt. 42, and filed an accompanying memorandum of law, Dkt. 43 ("Def. Strike Br.").  On November 13, 2013, Hilton filed its reply, Dkt. 61 ("Pl. Reply Br."), and its opposition to the motion to strike, Dkt. 67 ("Pl. Strike Opp.").  On November 20, 2013, WHG submitted its reply in support of its motion to strike.  Dkt. 69 ("Def. Strike Reply.").

## II.    WHG's Motion to Strike

WHG moves to strike the SALT surveys as hearsay.  However, the SALT surveys are non-hearsay.  Hilton does not ask the Court to consider them for the truth of the matters asserted, *e.g.*, whether the Hotel's rooms were in fact clean, but rather to establish the views that guests reported to it about those matters, *e.g.*, whether guests reported to Hilton that the Hotel's rooms

were clean.  *See* Fed. R. Evid. 803(3); *Schering Corp. v. Pfizer Inc.*, 189 F.3d 218, 227 (2d Cir.

1999) ("The great majority of surveys admitted in this Circuit, including those used in Lanham

Act cases to establish actual confusion or secondary meaning, fall into this category: they poll

individuals about their presently-existing states of mind to establish facts about the group's

mental impressions.").

Relevant here, the FLA appears to contemplate a quality assurance process that takes into

account guests' views, irrespective of whether reasonable minds could differ with those views.

*See* FLA § 3(e) ("We will administer a quality assurance program for the System which may

include conducting periodic inspections of the Hotel and guest satisfaction surveys and audits to

ensure compliance with System standards.").  That is perfectly understandable:  A responsible

hotel chain logically should care about what their guests think, even if officials of the chain or a

franchise might take issue with the guests' views.  Put differently, if guests consistently found

the Hotel's service to be lacking, as the SALT surveys indicate, that is meaningful information to

the franchisor, regardless whether the Hotel's service was, in some sense, "objectively" bad.  The

Court accordingly considers, on the motion for summary judgment, the SALT surveys solely for

the purpose of determining what guests reported they thought about the Hotel.  The Court

accordingly denies WHG's motion to strike the SALT surveys as hearsay.

## III.    Applicable Legal Standard

To prevail on a motion for summary judgment, the movant must "show[] that there is no

genuine dispute as to any material fact and the movant is entitled to judgment as a matter of

law."  Fed. R. Civ. P. 56(a).  The movant bears the burden of demonstrating the absence of a

question of material fact.  In making this determination, the Court must view all facts "in the

light most favorable" to the non-moving party.  *Holcomb v. Iona Coll.*, 521 F.3d 130, 132 (2d Cir. 2008); *see also Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986).

To survive a summary judgment motion, the opposing party must establish a genuine issue of fact by "citing to particular parts of materials in the record."  Fed. R. Civ. P. 56(c)(1); *see also Wright v. Goord*, 554 F.3d 255, 266 (2d Cir. 2009).  "A party may not rely on mere speculation or conjecture as to the true nature of the facts to overcome a motion for summary judgment."  *Hicks v. Baines*, 593 F.3d 159, 166 (2d Cir. 2010) (citation omitted).  Only disputes over "facts that might affect the outcome of the suit under the governing law" will preclude a grant of summary judgment.  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).  In determining whether there are genuine issues of material fact, the Court is "required to resolve all ambiguities and draw all permissible factual inferences in favor of the party against whom summary judgment is sought."  *Johnson v. Killian*, 680 F.3d 234, 236 (2d Cir. 2012) (citing *Terry v. Ashcroft,* 336 F.3d 128, 137 (2d Cir. 2003)).

## IV.    Discussion

### A.    Hilton Had a Right to Terminate the FLA

Hilton moves for summary judgment on the grounds that it was within its rights under the FLA to terminate its contract with WHG, because the Hotel repeatedly failed its evaluations.  Pl. Br. 12.  WHG, notably, does not dispute that the Hotel repeatedly failed those evaluations, that WHG had agreed to give Hilton "the right to . . . determine if the Hotel is in compliance with the standards and rules of operation set forth in this Agreement and in the Manual," FLA § 3(e), or that WHG had agreed to give Hilton "the right to terminate this Agreement immediately upon notice to you if you fail to cure an Event of Default," which "will occur if you fail to satisfy or comply with any of the obligations, requirement, conditions, or terms set forth in [among other

things] this Agreement [and] the Manual (including standards in the Manual and minimum performance scores required by the Manual), *id.* § 14(a). Rather, WHG argues that Hilton was required to evaluate the Hotel's performance reasonably and in good faith, but did not do so, because (1) its evaluations were inconsistent, arbitrary, and lacked an objective scoring scale, and (2) it acted in bad faith, and was subjectively motivated by a desire to get rid of the Hotel to make way for a new one. Def. Br. 18–23. Hilton denies that its evaluations were arbitrary and inconsistent. Pl. Reply Br. 5–9. As for bad faith, Hilton argues that, because it acted within its legal rights in terminating the FLA, its subjective motivations are legally irrelevant. *Id.* at 12.

As to the law, Hilton is correct. Hilton was obliged to conduct its evaluations consistent with the covenant of good faith and fair dealing, which is implied in all contracts under New York law. *See, e.g.*, *State Street Bank & Trust Co. v. Inversiones Errazuriz Ltd.*, 374 F.3d 158, 169 (2d Cir. 2004). Hilton's implied promise to exercise good faith included "any promises which a reasonable person" in WHG's position "would be justified in understanding were included." *Dalton v. Educ. Testing Servs.*, 87 N.Y.2d 384, 389 (1995) (citation omitted). In cases such as this, "[w]here the contract contemplates the exercise of discretion, this pledge includes a promise not to act arbitrarily or irrationally in exercising that discretion." *Id.* (citation omitted). Thus, Hilton was under an obligation to conduct its evaluations in good faith and not arbitrarily or irrationally.

The covenant of good faith does not, however, justify an inquiry into Hilton's subjective motives for terminating the contract. "As long as a party has the legal right to terminate its obligation under the contract, it is legally irrelevant whether the party was also motivated by reasons which would not themselves constitute valid grounds for termination of the contract." *Major Oldsmobile, Inc. v. Gen. Motors Corp.*, 101 F.3d 684, at *3 (2d Cir. 1996) (unpublished

opinion) (citation omitted); *see also Thomas E. Hoar, Inc. v. Sara Lee Corp.*, 164 F.3d 619, at \*1 (2d Cir. 1998) (unpublished opinion) ("We agree with the district court that Hoar's nonpayment furnished a good faith reason to terminate for cause and made any allegations of other improper motives irrelevant to a determination of good faith performance."); *Farberware Licensing Co. LLC v. Meyer Mktg. Co., Ltd.*, No. 09 Civ. 2570 (HB), 2009 WL 2710209, at \*2 (S.D.N.Y. Aug. 25, 2009) (it is a "well-established rule that motive is irrelevant to the issue of whether a non-breaching party properly terminated a contract where that party has established an independent legal right to terminate").

The decisive factual question, then, is whether Hilton conducted the evaluations of the Hotel consistent with the covenant of good faith and fair dealing. If it did so, then, as WHG does not contest, the evaluations would have provided Hilton with a valid legal basis for terminating the FLA, and it is legally irrelevant whether Hilton was motivated to terminate the FLA because of the Hotel's failure to pass the evaluations, for an independent reason, or for a combination of these reasons.[7]

WHG has the burden of proving that Hilton acted inconsistently with the covenant of good faith and fair dealing. *See Tractebel Energy Mktg., Inc. v. AEP Power Mktg., Inc.*, 487

---

[7] WHG appears to argue that the FLA was a satisfaction contract in which its obligation was only to perform in such a manner that "a reasonable man" would "be satisfied with the performance." Def. Br. 17–18 (quoting *J.D. Cousins & Sons, Inc. v. Hartford Steam Boiler Inspections & Ins. Co.*, 341 F.3d 149, 153 (2d Cir. 2003)). But this standard only applies to satisfaction contracts that are ambiguous as to the standard of satisfaction. *See Misano di Navigazione, SpA v. United States*, 968 F.2d 273, 274 (2d Cir. 1992) ("When a contract conditions performance upon the satisfaction of one party and is ambiguous as to the applicable standard of satisfaction, courts generally require performance to the satisfaction of a reasonable man, particularly when a definite objective test of satisfaction is available."). Here, the FLA specifies that satisfaction shall be determined at least in part by the Quality Assurance evaluation process. The Court may not supplant that agreed-upon provision with a reasonable man standard. *See Rus, Inc. v. Bay Indus., Inc.*, 322 F. Supp. 2d 302, 309 (S.D.N.Y. 2003) (Lynch, J.) ("[A] court may not draw any inference or give any construction to the terms of a written contract that conflicts with the clearly expressed language of the written agreement.").

F.3d 89, 98 (2d Cir. 2007) ("'Since there is a presumption that all parties act in good faith, the burden of proving a breach of the covenant of good faith and fair dealing is on the person asserting the absence of good faith.'") (quoting 23 Williston on Contracts § 63:22 (4th ed. 2006)).  But WHG has not established a genuine issue of material fact as to whether Hilton's conduct in performing the evaluations violated the covenant of good faith and fair dealing. Indeed, WHG has not adduced any evidence that the long line of failed evaluations of the Hotel were performed in bad faith.

To be sure, WHG can point to a number of emails indicating that Hilton managers wished for "the QA [Quality Assurance] process to terminate the hotel."  Barone Decl. Ex. A at 9, 12, 13.  But, despite the opportunity to take full document and deposition discovery, WFG has not identified any evidence that this hope on the part of Hilton's managers was communicated to, let alone affected, the inspectors who actually conducted the evaluations.  Further, the emails on which WHG relies reveal that the Hilton managers' hope that the Hotel would be terminated was itself a product of the Hotel's track record of failure, as overwhelmingly chronicled in years of negative evaluations.  *See id.* at 9 ("always suffered from product issues"); *id.* at 10 ("five consecutive unacceptable evaluations mainly due to poor SALT scores and brand standards violations"); *id.* at 14 ("never represented the brand well"); *id.* at 21 ("underwhelming asset"), *id.* at 24 ("plagued by so-so management . . . nightmarish Q/A track record"), *id.* at 27 ("always been plagued by product problems").  This is not evidence of bad faith:  It is evidence that Hilton's managers, on the merits, had concluded that the Hotel was a bad asset and hoped that the Quality Assurance process would validate that, thereby contractually allowing Hilton to terminate the Hotel.  WHG's contrary allegation of bad faith is wholly conclusory, reliant on

mere "speculation or conjecture as to the true nature" of Hilton's inspectors motives in conducting the evaluations. *Hicks*, 593 F.3d at 166.

Nor has WHG shown that an issue of material fact exists as to whether the evaluations were sufficiently arbitrary or irrational as to constitute a breach of Hilton's duty of good faith and fair dealing.  The summary judgment record reflects that the evaluation process that Hilton used for the Hotel is the same process it uses for its entire Hampton Inn chain of 1,800 hotels, including those it franchises and those it owns.  Pl. 56.1 ¶¶ 9–14.  This fact is probative of the evaluation process's regularity and evenhandedness.  The record also reflects that the hotel inspectors have substantial expertise:  Blagg, who conducted the last six evaluations of the Hotel, is responsible for evaluating approximately 90 hotels in the Northeast, and evaluates each hotel twice per year.  Blagg Supp. Decl. ¶ 2.  And Hilton's scoring rubric is detailed and appears to vary little, if at all, between evaluations.  The SALT surveys, meanwhile, are used for the entire Hilton family of hotels.  McManus Decl. ¶ 3.

To be sure, some aspects of the scoring system are opaque; there may have been some inconsistencies between evaluations; and there is subjectivity to the evaluations, as one might expect where matters such as cleanliness are at issue.  But an evaluation system need not be perfect to be consistent with the covenant of good faith and fair dealing.  It need only be rational and non-arbitrary—and WHG 's complaints and excuses do not raise an issue of material fact as to whether Hilton's widely-used, detailed, and thorough system is so irrational and arbitrary as to violate its duty of good faith and fair dealing.  *Cf. Ramada Worldwide, Inc. v. Rip Mgmt. Grp. Corp.*, Civ. No. 07-1540 (WHW), 2009 WL 1810733, at *5 (D.N.J. June 25, 2009) ("Rather than make the required showing of bad faith or ill motive, defendants challenge the accuracy of the QA inspections, focusing on inconsistent deductions for certain items . . . .  The Court is . . .

28

unpersuaded."); *In re Gainesville P-H Properties, Inc.*, 77 B.R. 285, 291 (Bankr. M.D. Fla. 1987) ("Days Inns' Q.A. program, like any quality assurance program, contains an element of subjectivity; but that is not grounds to invalidate the system or to deny enforcement of the termination of the agreement with the franchisee or licensee who fails to comply with the quality assurance program.").

Separately, in its declarations, WHG appears to attempt to excuse the Hotel's poor performance on the evaluations by pointing to its age, *see, e.g.*, Nayak Decl. ¶ 30; its stated inability to conform to the Hampton Inn prototype and "evolving brand standards," including that of having a breakfast room on the first floor, *see, e.g.*, Shah Decl. ¶¶ 12, 46–51; and its receipt of waivers as to certain Hampton Inn requirements, *id.* ¶ 21.  WHG thereby implies that it was somehow set up for failure:  An official states that Hilton "gave us every reason to believe we could successfully own and operate a Hampton Inn, and granted us a sixteen year term to recoup our substantial investment in the 2004–06 PIP," but then changed its mind because of "its commitment to develop its brand via uniform prototypical hotels, and 'provide guests of Hampton Inn hotels with an experience that is consistent, regardless of the individual hotel.'"  *Id.* ¶¶ 33–34, 43 (quoting Pl. 56.1 ¶ 10); *see also* Nayak Decl. ¶ 11 ("[E]veryone understood our Hotel was not initially built to be a Hampton and had design and layout limitations, so instead of being required to make expensive, and potentially impossible structural changes, 'many waivers' were granted, and the Hotel did not need to be rebuilt to fully conform to the then prevailing Hampton standards.").  WHG also appears to justify some of its poor grades as the product of its "very low vacancy rate," which, purportedly, resulted in an unusually high wear and tear.  Nayak Decl. ¶¶ 23–31.

These arguments fail for a number of independent reasons.  Most important, there is no contractual basis for these arguments.  WHG voluntarily entered into a contract, the FLA, which sets out the standards as to which the Hotel was to be judged, and does not provide for lenient grading or forgiveness based on the Hotel's layout, age, or other factors.  On the contrary, the contract contains an explicit merger clause stating that it, the FLA, is the "entire agreement" and that the parties place "no reliance" on any outside "discussions or writings."  FLA § 16(d).  The FLA also disclaims any waivers not "in writing, specifically identified as an amendment to this Agreement, [and] signed by one of our officers."  *Id.*  And the FLA provides that "[n]o failure by us or by any of the Entities to exercise any power given us under this Agreement or to insist on strict compliance by you with any of your obligations, and no custom or practice at variance with the terms of this Agreement, will be considered a waiver of our or any Entity's right to demand exact compliance with the terms of this Agreement."  *Id.*

Second, WHG did obtain certain contractual waivers from ordinary Hilton protocol based on the Hotel's distinctive geography:  It was allowed to have a breakfast room located on its second rather than first floor, and it was exempted from the requirement of having a swimming pool.  *See* Koch Decl. ¶ 19; Shah Decl. ¶ 21.  But the presence of these explicit carve-outs undermines WHG's claim that Hilton was somehow, *sub silentio*, contractually obligated to give it leniency as to the application of other Hilton requirements based on structural or age factors.

Third, WHG has not persuasively explained why the Hotel's persistent and broad-based failing grades on its evaluations derive from the factors it identifies.  WHG seeks to excuse its poor performance on the SALT survey by pointing to its atypical layout.  According to WHG, guests expected a typical classic Hampton Inn experience, including a "Perfect Mix Lobby," an indoor pool, and wider bedrooms, and after not finding those items at the Hotel, gave it lower

SALT scores. Shah Decl. ¶¶ 12–13, 48–51. As a result, WHG argues, the SALT surveys were "inherently biased" against it. *Id.* ¶ 13. But the Hotel's atypical layout does not explain why it received consistently SALT lower scores for *overall service*, and it was that SALT score that caused the Hotel to fail repeated evaluations.[8] Finally, to the extent that the declarations could be read to articulate a defense of impossibility or frustration of purpose—and WHG's brief nowhere so state—those arguments would fail. As a matter of law, those defenses both require that the event which caused the impossibility or frustration of purpose have been unforeseeable at the time of the contract, *Warner v. Kaplan*, 892 N.Y.S.2d 311, 314–15 (1st Dep't 2009), and no evidence has been presented to the Court that would support such a thesis.

### B.    WHG's Counterclaim

WHG counterclaimed for costs it incurred in renovating the Hotel and in re-identifying the Hotel with a new brand after Hilton terminated the FLA. However, as WHG acknowledges, its counterclaim has force only if Hilton's termination of the FLA was a wrongful breach. Def. Br. 25–27. In light of the Court's holding that Hilton validly terminated the FLA consistent with its provisions, and that Hilton did not violate the covenant of good faith and fair dealing in doing so, the Court grants summary judgment to Hilton on WHG's counterclaim.

---

[8] On the last two evaluations, dated September 28, 2011 and April 17, 2012, the Hotel also received Unacceptable scores on the guest room cleanliness portion of the SALT, which provided an independent basis for failing the overall evaluation. Blagg Decl. Exs. E, G. WHG does not explain why inadequate guest room cleanliness resulted from the Hotel's atypical layout, though WHG does state, generally, that, its "attempt[] to incorporate as many of the furnishings and features that guests now expect from the typical Hampton Inn prototype . . . [made] our rooms look even smaller, cluttered, and unkempt." Shah Decl. ¶ 51. In any event, the Hotel's failing score on the overall service portion of the SALT was alone enough to cause it to fail each of those evaluations.

### C.    Damages

#### 1.    Past Due Fees

Hilton seeks, and WHG has admitted that it owes Hilton, $29,702.09 in past due fees.

Def. Resp. to Pl. 56.1 ¶ 199; *see also* FLA § 14(c) (providing for payment upon termination

under §§ 14(a) or 14(b) of "all amounts owed to us for periods prior to the date of termination.").

Accordingly, the Court grants summary judgment to Hilton on its claim for past due fees of

$29,702.09.

#### 2.    Liquidated Damages

Hilton also moves for summary judgment on its liquidated damages claim of

$672,653.26.

The FLA provides that if Hilton terminates the contract under §§ 14(a) or 14(b),

WHG will pay

> as liquidated damages for the future Monthly Royalty Fees and Monthly Program
> Fees we will lose, a "Termination Fee" determined by multiplying the average of
> the Monthly Royalty Fees and Monthly Program Fees . . . with respect to the
> Hotel for the twenty-four (24) month period immediately preceding the month of
> termination, by thirty-six (36), or by such lesser multiple as would represent the
> remaining full or partial months between the date of termination and the
> expiration of the License Term.

FLA § 14(c).  In other words, if the FLA is terminated three years or more before it was set to

expire, the FLA provides for liquidated damages equal to three years' worth of royalties and

program fees, calculated based on the average fees over the last two years.

WHG does not dispute the meaning of FLA § 14(c), that the contract was terminated

under § 14(a) so as to trigger the liquidated damages clause of § 14(c), or the manner in which

Hilton calculated its asserted liquidated damages of $672,652.26.  Def. Resp. to Pl. 56.1 ¶¶ 200–

205.  Rather, WFG argues that the three years' worth of payments in the liquidated damages

clause constitutes an unenforceable penalty.  Def. Br. 23–25.[9]

Under New York law, a liquidated damages provision "will be sustained if the amount

liquidated bears a reasonable proportion to the probable loss and the amount of actual loss is

incapable or difficult of precise estimation.  If, however, the amount fixed is plainly or grossly

disproportionate to the probable loss, the provision calls for a penalty and will not be enforced."

*JMD Holding Corp. v. Cong. Fin. Corp.*, 4 N.Y.3d 373, 380 (2005).  Thus, WHG "must

demonstrate either that damages flowing from a prospective early termination were readily

ascertainable at the time" WHG and Hilton signed the FLA, "or that the early termination fee is

conspicuously disproportionate to these foreseeable losses."  *Id.*  "It is also well established that

courts must measure the validity of a liquidated damages clause as of the time the parties entered

into the agreement at issue, not at the time of the breach, and that such a determination is a

matter of law to be decided by the court."  *Howard Johnson Int'l Inc. v. HBS Family, Inc*., No.

96 Civ. 7687 (SS), 1998 WL 411334, at *5 (S.D.N.Y. July 22, 1998) (Sotomayor, J.).  "[T]he

party opposing enforcement of a liquidated damages provision bears the burden of proving that

the provision operates as a penalty."  *FCS Advisors, Inc. v. Fair Fin. Co., Inc.*, 378 F. App'x 65,

68 (2d Cir. 2010) (citations omitted).  "The New York Court of Appeals has recently cautioned

courts against interfering with liquidated damages provisions."  *4 Third Ave. Leasehold, LLC v.*

---

[9] WHG also appears to argue that because Hilton had been planning to terminate the FLA, it "effectively" terminated the FLA before the Notice of Termination's effective date of August 31, 2012, such that "there needs to be a finding of fact made with respect to when [Hilton] effectively terminated the FLA, and any royalties paid, or to be paid, by WHG during that time should be credited against the amounts [Hilton] claims as liquidated damages."  Def. Br. 23. This argument lacks merit.  The FLA clearly states that the liquidated damages payments are to be calculated for a 36-month period.  FLA § 14(c).  Fees paid or accrued before the effective date of termination would constitute "amounts owed to us for periods prior to the date of termination," which WHG is obligated to pay in addition to whatever liquidated damages it owes.  *Id.*

*Permanent Mission of United Arab Emirates to United Nations*, 133 F. App'x 768, 770 (2d Cir. 2005) (citing *JMD Holdings*, 4 N.Y.3d at 381).

WHG has not met its burden of proving either that damages were "readily ascertainable" at the time the FLA was signed or that the three years' worth of fees in the liquidated damages provision is "plainly or grossly disproportionate to the probable loss."  Indeed, beyond a string cite establishing that liquidated damages provisions of two years' worth of royalties are enforceable, Def. Br. 23–24, WHG's argument is cursory in the extreme.  WHG has given the Court no basis to find that damages were readily ascertainable at the time the contract was signed.  The closest it comes are quotes from three prior cases, respectively stating that it takes an average of two years to replace a Ramada Inn or a Days Inn.  Def. Br. 23–24 (citing *Ramada Franchise Sys., Inc. v. Motor Inn. Inv. Corp.*, 755 F. Supp. 1570, 1579 (S.D. Ga. 1991) ("There is no dispute here that two years is the average time it takes to find a replacement; thus, the time is reasonable."); *Ramada Franchise Sys., Inc. v. Cusack Dev., Inc.*, No. 96 Civ. 8085 (MGC), 1999 WL 165702, at *8 (S.D.N.Y. Mar. 24, 1999) ("[T]he use of a two-year period to compute future damages is reasonable. According to Ramada, a hotel franchise company requires two years on average to replace a lost franchisee in a given market."); *Days Inn Worldwide, Inc. v. Amar Hotels, Inc.,* No. 05 Civ. 10100 (KMW)(KNF), 2008 WL 2485407, at *5 (S.D.N.Y. June 18, 2008) (quoting plaintiff's statement to that effect without approval or disapproval)).  But WHG does not supply any basis on which the Court could find that three years' worth of fees is "plainly or grossly disproportionate to the probable loss."  WHG merely shows that, in the franchise hotel context, courts have upheld liquidated damages clauses providing for two years' worth of fees.  But the legality of a two-year provision does not prove the illegality of a three-year provision.  There is no record basis on which the Court could conclude that a three-year

provision is beyond the pale. *See Choice Hotels Int'l, Inc. v. Chewl's Hospitality, Inc.*, 91 F. App'x 810, 817 (4th Cir. 2003) (party opposing enforcement "failed to demonstrate that the [3-year] liquidated damages provision in the franchise agreement was a penalty"). WHG therefore fails to meet its burden as the party opposing enforcement of the contractual provision.

## CONCLUSION

The Court grants Hilton's motion for summary judgment and awards it damages of $29,702.09 in past due fees and $672,653.26 in liquidated damages, for a total of $702,355.35. The Court also grants summary judgment to Hilton on WHG's counterclaim.

Hilton has advised the Court that it believes that it is entitled to recover attorneys' fees under FLA § 7(f) and that it will move for fees upon entry of judgment. Pl. Br. 26 n.7. This Opinion expresses no view as to the merits of that claim. If Hilton wishes to move for attorneys' fees, the Court directs it to do so by February 11, 2014; and for WHG to respond, if at all, by February 25, 2014. Otherwise, the Court will close this case.

The Clerk of Court is respectfully directed to terminate the motions at docket numbers 33 and 42.

SO ORDERED.

*Paul A. Engelmayer*

Paul A. Engelmayer
United States District Judge

Dated: January 28, 2014
    New York, New York

35